UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>AMIR KALOMO MULAMBA,<br>Defendant. | 4:21-CR-40153-KES<br><br>REPORT AND RECOMMENDATION |
|---|---|

## INTRODUCTION

Defendant Amir Kalomo Mulamba is charged with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a) & (e). Docket No. 1 at p. 1. Mr. Mulamba moves to suppress digital evidence found on his phone due to its allegedly unlawful seizure. Docket No. 98 at p. 1. He further attacks the legality of the subsequent search of his phone due to lack of consent, the “omissions and false statements in the affidavit supporting the search warrant,” and the fact that “[l]aw enforcement’s search and seizure of [his] cellular phone data exceeded the scope of the warrant.” Id. The government resists the motion. Docket No. 109. The matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.S.D. L.R. CRIM 57.11(A)(2)(a).

## FACTS[1]

An evidentiary hearing was held on November 14, 2024. Mr. Mulamba attended in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley. The government was represented by its Assistant United States Attorney, Elizabeth Ebert-Webb. Four witnesses testified and thirty-two exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

### A. Initial Investigation

On June 21, 2021, Sioux Falls, South Dakota Officer Robert Olson was dispatched to the home of A.R., who reported that her daughter, E.R., had been offered disposable vape pens in exchange for sex from an unknown man. Ex. 3 at pp. 2–3. She also stated that the previous night, E.R. had left the apartment to speak with someone in a dark grey car, later identified as a 2015 Dodge Dart SXT. Id. at p. 3. A.R. pulled up behind the vehicle and was able to write down its license plate number. Id. A.R. was suspicious about the vehicle so she checked E.R.'s Snapchat messages on her phone. Id. A.R. suspected that her daughter had been speaking to older men months prior, and E.R. had recently been given an ankle monitor due to her behavior. Id.

Reading through her Snapchat messages, A.R. stated that her daughter had been solicited for sex in exchange for disposable nicotine pens by an individual going by "Amiro Fenomeno." Id. A.R. believed the driver of the

[1] All facts not otherwise cited reflect the testimony of the witnesses. For readability, quotation marks are omitted from citations to Officer Robert Olson's case report (Exhibit 3).

Dodge was the same person. When Officer Olson ran the license plate number retrieved by A.R., it came back registered to Amir Mulamba. Id.

E.R. first told Officer Olson that she had met her friend M.N. outside on the night in question—not Amiro Fenomeno. Id. Later, she stated that Amiro Fenomeno was to bring the vape pen Saturday night but ended up not coming. Id. She stated that she had only been speaking with Amiro Fenomeno for the past four days, but her mother stated that she had seen messages from him dating back to a month ago. Id.

Amiro Fenomeno called E.R.'s phone during this interview, and when A.R. answered the phone, he did not speak with her. Id. A.R. told Amiro Fenomeno the police were notified. Ex. 6 at p. 2. Amiro Fenomeno then deleted his messages to E.R. Id.; see Ex. 1-I. Amiro Fenomeno also called back repeatedly. Ex. 1-I; Ex. 3 at p. 3. E.R. told Officer Olson that she did not know what Fenomeno looked like. Ex. 3 at p. 3. She later recanted, saying that he was black, 25 years old, and had a little bit of a beard. Id. She later admitted to having gone outside to get a disposable vape pen from Fenomeno. Id. She had supplied him her address through Snapchat. Id.

When asked about the contact she had been having with Fenomeno, E.R. stated that he had not originally asked for anything in return for the vape pen. Id. She did, however, state that he told her, "I want you to have my babies," and that "he wanted me to be his surrogate." Id. When asked whether Fenomeno asked her for anything in return when she went to retrieve the vape pen, E.R. stated that he "asked me to make out with him." Id. Exhibit 1-A

depicts a Snapchat message from E.R. to an unknown person that states "the 25 y/o just asked to make out-for a dispo," followed by a surprised face emoji. It also shows her face with a surprised look. E.R. stated to the officers that Fenomeno asked her to get in the car with him, but she refused and ran back into her house. Ex. 3 at p. 3. Officer Olson reviewed two messages between E.R. and Fenomeno he considered noteworthy—one where Fenomeno stated that he had to take her out, and one that stated, "you like to moan." Id.; see Ex. 1-D.

The next morning, Officer Olson followed up at A.R.'s house, where A.R. showed him a Snapchat video where E.R. was walking up the stairs, stating, "Going back upstairs because my mom is outside," while wearing a sports bra and a light coat. Ex. 3 at p. 3; see Ex. 2. A.R. believed E.R. had agreed to sexual favors in exchange for the disposable vape pen. Ex. 3 at p. 3.

**B. Interview of Mr. Mulamba**

On June 25, 2021, at 8:56 a.m., Detective[2] Seth Meier of the Sioux Falls Police Department and Special Agent Andrew Jacob of the Department of Homeland Security Investigations ("HSI") visited Mr. Mulamba's house to conduct an interview with him. Ex. 4 at 0:00–24. Det. Meier testified that the purpose of this interview was to collect information; he believed there was not at this point probable cause to arrest Mr. Mulamba. Unbeknownst to SA Jacob

[2] At the hearing, Seth Meier testified that his current title is patrol officer for the SFPD. To avoid the confusion of alternating titles, this opinion refers to him as "Detective" throughout.

at the time, Det. Meier was recording their interaction with Mr. Mulamba that day.

Before this interview, SA Jacob testified that he had an opportunity to speak with A.R., who was concerned because E.R. either had a history of having sex with older men or sending sexual images to older men. SA Jacob testified that A.R. was concerned that E.R. was in possession of around $300, and it was a possible concern that Mr. Mulamba gave E.R. this money. The only report of this meeting was created on November 12, 2024, two days before the suppression hearing and almost three and a half years after the meeting. See Ex. A at p. 2.

At Mr. Mulamba's interview, Det. Meier testified that he and SA Jacob were wearing plain clothes. Upon arriving, the officers noticed the same car with the same license plate referenced in the police report. Det. Meier compared Mr. Mulamba's driver's license with the selfies obtained from E.R. and he testified they matched. After the officers knocked on the door of Mr. Mulamba's residence, a man, later identified in testimony as Mr. Mulamba's father, answered the door and told the officers that Mr. Mulamba lived at the residence and was home. The officers asked the father to retrieve Mr. Mulamba to answer a few questions. Id. at 3:00–28. Mr. Mulamba came out to the officers approximately twenty-five seconds later. Id. at 3:50.

Det. Meier asked Mr. Mulamba whether the Dodge parked in front of the house was his. Id. at 4:10–13. Det. Meier told Mr. Mulamba that his vehicle

was "kinda seen in an area" and that he wanted to figure out whether the vehicle was Mr. Mulamba's and "things like this." Id. at 4:13–25. Mr. Mulamba confirmed that he was the primary driver of the car, but that sometimes others (his father, his sister) drove it because a different car was not working. Id. at 4:29—5:26.

Mr. Mulamba explained that he worked in the kitchen at the jail. He told the officers he was attacked on April 2 by inmates at the prison and suffered a head injury, and that he had been receiving workers' compensation but was now on minimal duty. Id. at 5:26—6:11, 7:53–55; see generally Exs. B–D (hospital and ambulance records related to injury). Mr. Mulamba stated he still did not feel well after his surgery. Ex. 4 at 6:35—7:05. He stated the inmates broke his zygomatic arch,[3] that he took "a lot of medicine," and suffered lingering effects to his jaw. Id. at 7:05–27.

Mr. Mulamba stated he also suffered a concussion, and that he would say he recovered from the concussion, but that one never could tell for sure because of the effects of a concussion. Id. at 7:27—8:00. The officers asked questions bent toward determining whether Mr. Mulamba could exercise good judgment to which he replied that he was getting better, but that sometimes he had difficulty. Id. at 8:00—9:39. He stated he had returned to driving. Id. He stated he was working 40-hour weeks if he could manage it. Id. Det. Meier

---

[3] The zygomatic arch is "one of two curved bone structures around each side of the face that protect the eye, including the cheekbone and a narrow piece of bone that joins this to the side of the skull. *Zygomatic arch*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/zygomatic-arch (last visited Nov. 15, 2024) [https://perma.cc/F2PH-PGM8].

testified that Mr. Mulamba appeared tired, but did not have any bandages, or braces, or "anything about his physical appearance that would indicate a physical injury." Det. Meier testified Mr. Mulamba was not slurring his words; he was making eye contact; he understood the questions being asked. Det. Meier testified that he "observed no diminished capabilities of any sort." SA Jacob also testified that Mr. Mulamba's father was not concerned with the questioning, but rather told the officers to do their job.

Det. Meier asked where Mr. Mulamba was Sunday night at 11:00 p.m. Id. at 13:30–57. Mr. Mulamba stated he "was supposed to go to the gym." Id. at 14:00–04. Det. Meier told Mr. Mulamba that somebody reported a suspicious vehicle with his license plate. Id. at 14:10–36. Later, Mr. Mulamba told officers that the only time he drove around was in relation to the gym. Id. at 21:53—22:04. Det. Meier told Mr. Mulamba that the person who called 911 thought the driver of the car may have been communicating with members of their family. Id. at 15:40—16:00. Det. Meier asked about Mr. Mulamba's use of Snapchat and other apps. Id. at 16:00–20. He asked if Mr. Mulamba had his phone on him. Id. at 16:20–22. Det. Meier said, "you don't have to," but asked if Mr. Mulamba would mind showing him his Snapchat handle ("or Facebook or anything like that?") so that he could write it down. Id. at 16:23–36. Det. Meier asked if Mr. Mulamba had been talking to girls on dating apps. Id. at 18:00–35. Mr. Mulamba stated he was on Tinder. Id. at 18:50—19:02.

SA Jacob asked Mr. Mulamba to go get his phone so that they could look at his Tinder and see if the person they were looking for was on there, to which

Mr. Mulamba agreed. Id. at 22:00–39. In Mr. Mulamba's absence, the officers discussed whether they had probable cause to hold the phone, and surmised that if Mr. Mulamba did not return soon, he was "deleting stuff." Id. at 22:39—24:03. About a minute after that, SA Jacob stated, "he's totally deleting stuff," but remarked that he had been told in the past that anything deleted could be recovered, which Detective Meier agreed he had seen before. Id. at 25:00–13.

Mr. Mulamba returned about three minutes after he went to retrieve his phone. Id. at 25:30. Mr. Mulamba was showing the officers his Tinder when SA Jacob said, "is that girl under [E] that you were telling us about?" Id. at 25:40–52. But Mr. Mulamba had only previously talked to them about a girl named Belshiba.

SA Jacob noted that there were two girls named [E] on Mr. Mulamba's Tinder, and asked if he had ever met up with any of those girls, to which Mr. Mulamba replied no. Id. at 25:52—26:54. Mr. Mulamba confirmed he only had Wi-Fi access, not phone service. Id. at 29:00–30. SA Jacob asked Mr. Mulamba if he could open his Snapchat. Id. at 29:49. SA Jacob testified that he managed to confirm then that Mr. Mulamba's username was "Amiro Fenomeno or Amir Fenomeno." SA Jacob testified that once the conversation turned to Snapchat, Mr. Mulamba's posture changed, and SA Jacob could no longer look over Mr. Mulamba's shoulder to see the phone screen.

Mr. Mulamba proceeded to explain the different contacts on his Snapchat—those he knew, those he did not. Id. at 30:00—31:44. The officers asked about an [E] that had provided her Snapchat handle on Tinder, and

whether he added her. Mr. Mulamba said he had, but she did not accept. He also stated he had four [E]s on his Snapchat, but that he had never met any of them. Id. at 31:44—32:35.

SA Jacob testified that Mr. Mulamba's thumbs were moving a lot on the screen, which Mr. Mulamba was looking at intensely. Mr. Mulamba was asked if he deleted anything. Id. at 32:35. He asked, "from here?" which the inquiring officer confirmed. Id. at 32:36–38. Mr. Mulamba changed the subject and returned to discussing different contacts. Id. at 32:38.

The officers then broached the subject of Mr. Mulamba signing a consent to search and handing over his phone so that they could do a dump of the phone. Id. at 33:13—34:15. SA Jacob told Mr. Mulamba that if he so agreed, he could have his phone back in a few hours. Id. SA Jacob told Mr. Mulamba that if there were pictures of him smoking weed, he did not care. Id. at 34:45—35:05. Mr. Mulamba said "maybe later today" because he needed his phone to talk to people. Id. at 35:22–29. Det. Meier stated that if Mr. Mulamba waited until later, he would be without his phone for the entire weekend. Id. at 35:30–40. Mr. Mulamba said he was OK with that so long as he had the opportunity to tell people he would be without his phone first. Id. at 35:40–57. SA Jacob asked if there was a reason Mr. Mulamba did not want them to take his phone. He replied, "yes, because I need to use it." Id. at 36:30–36.

The officers continued to attempt to persuade Mr. Mulamba to turn over his phone but told him it was ultimately his decision. Id. at 36:36—41:00. Mr. Mulamba said he needed to make some calls first and then he would give

them the phone. Id. at 41:45–50. SA Jacob said he wanted to take the phone now, to which Mr. Mulamba once again said he first needed to speak to some people. Id. at 45:30—46:00.

Mr. Mulamba expressed dislike for the pressure the officers were exerting on him and explained that his head injury required him to remain calm at all times. Id. at 46:00—47:00. SA Jacob told Mr. Mulamba thrice that anything he deleted from his phone could be later retrieved. Id. at 47:00—48:41. SA Jacob said that it looked like Mr. Mulamba was deleting things off his phone and asked what they were. Mr. Mulamba replied that it seemed the officers were looking for something related to "[E]." Id. at 48:35—49:32. SA Jacob testified that this suggested to him that Mr. Mulamba was keyed into what they were investigating. But he also acknowledged that he never gave Mr. Mulamba E.R.'s full name, and that Mr. Mulamba had been speaking with other women with the same first name. SA Jacob again asked him what he was deleting, and Mr. Mulamba responded, "Stuff that I don't want . . . stuff that I don't like." SA Jacob told him to stop repeatedly. Id. at 49:32—50:06.

SA Jacob told Mr. Mulamba that he was starting to believe that a crime did happen, and Mr. Mulamba was deleting evidence of a crime. Det. Meier testified that at no point did the officers either give Mr. Mulamba E.R.'s full name or explain what crime they were investigating. Mr. Mulamba asked, "what kind of crime," and SA Jacob responded, "I'm telling you to put your phone down, Amir." Id. at 52:20–40. SA Jacob testified that he did not tell Mr. Mulamba what he was looking for on Mr. Mulamba's phone. The

conversation turned to the fact that Mr. Mulamba was possibly deleting videos of him masturbating and that he did not want others to see such things. Id. at 53:00—54:00.

SA Jacob asked what the password was to get into Mr. Mulamba's phone and Mr. Mulamba provided it. Id. at 58:00–43. SA Jacob said he just got off the phone, and he was going to take Mr. Mulamba's phone from him. Id. at 58:44–58. SA Jacob testified that he called then-Assistant United States Attorney Jeff Clapper to ask whether exigent circumstances existed such that he could seize Mr. Mulamba's phone. SA Jacob testified that he received confirmation that he could lawfully seize Mr. Mulamba's phone. Although unclear because of the passage of time, SA Jacob testified he believed this confirmation was because Mr. Mulamba told officers he was deleting things, and that SA Jacob believed those things to be evidence of a crime. SA Jacob and Mr. Mulamba started arguing about whether Mr. Mulamba had the right to delete things that were embarrassing to him from his phone. SA Jacob told him he did not have that right. Id. at 58:58—59:40.

SA Jacob said he was forcing Mr. Mulamba to give him his phone because he would be applying for a search warrant. Id. at 59:45–50. Mr. Mulamba asked, "Did you get the search warrant?" Id. at 59:50–53. SA Jacob stated, "I just got off the phone with the attorney." Id. at 59:53–57. Mr. Mulamba asked, "And they gave you the search warrant?" Id. at 59:57–59. Both officers replied, "Yep." Id. at 59:59—1:00:01. Det. Meier testified that his interpretation of the question was "are we getting a warrant?" SA Jacob

testified that he interpreted the question as asking whether he had received permission to apply for a search warrant. SA Jacob testified he did not try to mislead Mr. Mulamba into thinking he already had a search warrant.

Over the next minute, SA Jacob explained to Mr. Mulamba that he planned to seize his phone to prevent the further deletion of evidence while he applied for a search warrant. Id. at 1:00:01—1:01:00. He told Mr. Mulamba that if he looked at his phone before he obtained a search warrant, he would go to jail. Id. Mr. Mulamba stated, "I understand." Id.

SA Jacob then told Mr. Mulamba that if he did not give him his phone, he would arrest him. Id. at 1:01:00–41. Mr. Mulamba gave the officers his phone, after which SA Jacob explained that Mr. Mulamba could either sign a consent to search that would result in him getting his phone back that day, or request that SA Jacob apply for a warrant, which would have him getting his phone back after the weekend. Id. at 1:03:00—1:05:40. He explained that the warrant would be because Mr. Mulamba had Fourth Amendment rights, to which Mr. Mulamba replied, "It doesn't feel like I have any rights at all" because he perceived the officers as threatening him. Id.

SA Jacob repeated the options that if Mr. Mulamba signed the form, he could take the phone to Madison to have it inspected straightaway, or he could write thirty pages to apply for a warrant which would result in a longer wait for Mr. Mulamba to be reunited with his phone. Id. at 1:09:00–38. SA Jacob explained that the form gave the officers consent to search the phone, and the officers pointed out the places where Mr. Mulamba should sign and print his

name. Id. at 1:09:38—1:10:03. Mr. Mulamba signed the form, and the officers put the phone into airplane mode and departed. Id. at 1:10:03—1:12:32; see Ex. 5.

Det. Meier retained his audio recording of the officers' interactions with Mr. Mulamba but did not advise SA Jacob of the existence of the recording nor did he send SA Jacobs a copy of the recording contemporaneously. At some point in 2023 SA Jacobs contacted Det. Meier in connection with Mr. Mulamba's case and Det. Meier mentioned the existence of the audio recording. It was at this point that SA Jacob first obtained and had an opportunity to listen to that recording.

**C. Follow-Up Interview with E.R.**

On June 29, 2021, SA Jacob and SA Craig Scherer interviewed E.R. Ex. 6 at p. 2. E.R. told the agents that she accepted Mr. Mulamba's friend request on Snapchat, thinking it was someone else. Id. E.R. stated that Mr. Mulamba asked her to have sex with him, but E.R. informed Mr. Mulamba that she was sixteen years old. Id. E.R. stated that Mr. Mulamba then asked E.R. to have his babies. Id. She told the officers that Mr. Mulamba "agreed to purchase a vape pen for [E.R.] and drop it off" the night of June 19th. Id. E.R. "informed [Mr. Mulamba] that [she] did not have any money but [Mr. Mulamba] said [he] would figure out another payment method." Id. Mr. Mulamba ultimately did not meet up with E.R. on the 19th—he allegedly told E.R. that he had "other appointments," which E.R. understood to mean he was "prostituting other females and having sex with them." Id.

E.R. stated that Mr. Mulamba called her on the night of June 20th and she accidently answered. Id. She stated Mr. Mulamba called E.R. pretty and the two conversed for a while. E.R. stated that during that conversation, Mr. Mulamba asked her to show her breasts. Id. E.R. stated she refused. Id. She stated that Mr. Mulamba informed her that he would arrive that night with the vape pen. Id. Around 11:15 p.m., Mr. Mulamba arrived and gave E.R. the vape pen. Id. E.R. stated that Mr. Mulamba informed her he possessed more vape pens, but "would only give [her] those vape pens the next time they hung out." Id. E.R. stated she feared Mr. Mulamba, so she grabbed one vape pen and ran back into her house. Id.

E.R. told the agents that she had previously communicated with two unknown men over Snapchat who sent her money. Id. at p. 3. One man, Ben from Iowa, had sent her approximately $300. Id. E.R. reported that this was the source of the money A.R. thought was from E.R. sending naked pictures to older men. Id. But E.R. told the agents she had only ever sent naked pictures to a 15-year-old boy that she liked. Id.

**D. Applications for Warrants**

In mid-July, SA Jacob applied to this court for a warrant to search Mr. Mulamba's phone. See generally Ex. 7. Despite having a consent form, SA Jacob testified he applied for a warrant because he wanted to "button up his search . . . in case there were any issues." SA Jacob testified he was sure the decision was discussed with an attorney, but he could not remember the precise reason. SA Jacob submitted that there was "probable cause to believe

that the cell phone . . . contain[ed] information that constitute[d] evidence or instrumentalities of criminal violations of Title 18 U.S.C. §§ 2251, 2252, and 2252A, involving violations of law involving sexual exploitation of children and child pornography." Id. at p. 4. The affidavit recounted the facts of the investigation as detailed above. See generally id.

When discussing E.R.'s Snapchat account, the affidavit noted, "I also observed a nude image of the Juvenile on the Juvenile's Snapchat account." Id. at p. 5. SA Jacob testified that he did not include the fact that E.R. told him that she had only ever sent a nude photo to a 15-year-old boy because of his concern of E.R.'s dishonesty. SA Jacob testified that he saw this image in a part of Snapchat entitled "My Eyes Only," which allows users to hide photos. SA Jacob testified no evidence showed that the photo was sent to Mr. Mulamba. SA Jacob testified that he believed he had probable cause with or without the statement about the nude image.

SA Jacob wrote that when Mr. Mulamba went inside to retrieve his phone during the interview, he returned approximately nine minutes later. Id. at p. 6. He wrote, "[d]ue to the length of time it took [Mr. Mulamba] to return, I believed [he] was deleting information from the phone." Id. SA Jacob testified he was unaware at the time he swore to the affidavit that an audio recording of the interview demonstrated Mr. Mulamba returned three—not nine—minutes later. SA Jacob testified that the nine-minute estimation was a mistake.

The application sought all records from May 1, 2021, related to violations of 18 U.S.C. §§ 2251, 2252, and 2252A, as well as "[e]vidence of user

attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted." Id. at pp. 10–11. This court signed the warrant on July 13, 2021. Id. at p. 2.

A couple of weeks later, SA Jacob's search of Mr. Mulamba's phone led to an application for a second warrant—this time to search Mr. Mulamba's Snapchat account. See generally Ex. 8. In this application, SA Jacob wrote, concerning E.R., "[p]arents of the minor observed unexplained money in possession of the minor, up to $300." Id. at p. 8. The affidavit further stated Mr. Mulamba "was believed to have sent this money." Id. SA Jacob testified that this was an error. SA Jacob testified that he did not include the fact that E.R. told him that the funds came from someone else because he felt it was irrelevant. The affidavit repeated that Mr. Mulamba was missing for nine minutes when he left to retrieve his phone. Id. at p. 9.

When examining Mr. Mulamba's phone, SA Jacob wrote that he discovered "[a]n approximately 58 second Snapchat-video . . . of an unidentified prepubescent juvenile ("H.N.B.") standing in what appears to be a bathroom. . . . The prepubescent juvenile lifts her shirt and exposes her breasts to the camera. . . . Mr. Mulamba said to [H.N.B.], 'Like turn around so I can see your ass dance or something.' " Id. at p. 10. SA Jacob testified that at the time, he thought that the photos depicted someone that would be considered prepubescent. He acknowledged that the photos depicted a female with fully developed breasts. He testified that today, he would refer to the same image as depicting a juvenile—not a prepubescent juvenile.

SA Jacob also described a 30-second video "of [H.N.B.] laying on her back and penetrating [her] vagina with what appears to be a hairbrush. [H.N.B.] then messaged [Mr. Mulamba] a picture of an iPhone through Snapchat and said, "a purple one of that bc my hone [sic] is no work a lot." Id. SA Jacob also described a conversation where Mr. Mulamba told H.N.B. that he would buy her a phone if she sent a video of her having sex. Id. H.N.B. sent a video "of an unknown female being penetrated by an erect penis." Id. SA Jacob also described a "47 second video of H.N.B." exposing her anus and vagina while Mr. Mulamba stated, "You are my bitch ok" and "before you go shake your ass" (later repeated in Spanish) to which she once again exposed her anus and vagina. Id. at p. 11.

HSI located H.N.B. in Salt Lake City, and she reported that she was communicating and sending naked videos to Mr. Mulamba in exchange for a new iPhone. Id. SA Jacob stated pictures on Mr. Mulamba's phone confirmed that he ordered an iPhone from Amazon that was delivered to H.N.B. Id.

The application sought Mr. Mulamba's (account Amir.Fenomeno) Snapchat files from January 1, 2021, to the present. Id. at pp. 13–14. This court signed the warrant on July 30, 2021. Id. at p. 2.

A few months later, SA Jacob applied for another warrant—this time to search a Gmail account. See generally Ex. 9. The affidavit for this warrant repeated the assertion that Mr. Mulamba took nine minutes to retrieve his phone. Id. at p. 6. This affidavit stated that H.N.B. told HSI investigators that she had told Mr. Mulamba several times that she was a juvenile, to which he

replied, "I don't care." Id. at p. 9. H.N.B. told agents that Mr. Mulamba promised H.N.B. an iPhone if she sent sexually explicit material to him. Id. The affidavit stated that when SA Jacob examined Mr. Mulamba's phone, he observed a Gmail address connected to it. Id. SA Jacob stated he issued a summons to Amazon for that email address, after which Amazon returned Mr. Mulamba's name and address as being linked to an account tied to the email address. Id. One of the addresses associated with that account was H.N.B.'s address in Utah. Id. The warrant sought all emails associated with the account from January 1, 2021, to the present, all instant messages since the account's creation, and other data related to the account. Id. at pp. 17–18. This court signed the warrant on October 1, 2021. Id. at p. 2. The court signed an extension on October 22, 2021. See generally Ex. 10.

A similar warrant to search Mr. Mulamba's Amazon account was signed on May 18, 2023. See generally Ex. 11. That warrant only included Mr. Mulamba's name; another warrant that associated the name to the Gmail account for identifying the correct Amazon account was signed on June 20, 2023. See generally Ex. 12.

**E. Process of Downloading Mr. Mulamba's Phone**

Joshua Hauck is a criminal analyst and computer forensics analyst for Homeland Security Investigations. See Ex. 19. He testified that part of his job is to download digital evidence from evidence received. Hauck executed a data extraction on Mr. Mulamba's cellphone pursuant to the first search warrant.

Hauck testified that the protocol in 2021 for such extractions involved first determining whether the phone could be downloaded using the software Cellebrite UFED 4PC. Analyst Hauck managed to complete an "advanced logical" extraction, parse the data, and create a "UFDR" Cellebrite report. Analyst Hauck then saved the report and the raw data to an external hard drive and into another storage area specific to his office. Analyst Hauck testified that he took all data from Mr. Mulamba's phone. He could not take data only from a specific time. However, he could, but did not, filter out data by category, such as the call log, or images. He also testified that he had, but did not use, the capability to create a report limited to the time range specified in the warrant.

Defense counsel suggested that Analyst Hauck was afraid to do so because sometimes when filters are applied, "certain things then don't show up.," to which Analyst Hauck replied, "correct." Analyst Hauck transferred everything to SA Jacob. Analyst Hauck testified it was then SA Jacob's responsibility to filter the results by date in accordance with the warrant. SA Jacob testified that he did that. Analyst Hauck testified this procedure tracked his training and industry standards, as well as internal policy at the time.

## DISCUSSION

### A. Whether Officers Unlawfully Seized Mr. Mulamba's Phone

Mr. Mulamba first argues that his phone was unconstitutionally seized because neither probable cause nor exigent circumstances existed. Docket No. 99 at pp. 11–12. The government responds that under the totality of the

circumstances, a fair probability existed that evidence of unlawful conduct existed on Mr. Mulamba's phone. Docket No. 109 at p. 18. The government further argues that exigent circumstances arose once Mr. Mulamba began deleting things from his phone. Id. at pp. 18–19. The government is correct.

The Fourth Amendment forbids the unreasonable seizure of a person's effects. U.S. CONST. amend IV. "The warrantless seizure of property is per se unreasonable unless it falls within a well-defined exception to the warrant requirement." Robbins v. City of Des Moines, 984 F.3d 673, 680 (8th Cir. 2021). One such exception is when an exigent circumstance arises, such as when officers' "need to prevent the destruction of evidence." Kentucky v. King, 563 U.S. 452, 455 (2011). Application of that exception requires both probable cause to search and a demonstration that absent officer intervention, the destruction of evidence would be imminent. United States v. Shrum, 59 F.4th 968, 972 (8th Cir. 2023) (citations omitted). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (quotation omitted). "The existence of exigent circumstances is an objective analysis focusing on what a reasonable, experienced police officer would believe." Id. (quotation omitted).

Turning to the facts, E.R.'s mother, A.R., reported to officers that she saw Snapchat messages from a user "Amiro Fenomeno" offering disposable nicotine pens to E.R. in exchange for sex. Ex. 3 at p. 3. And while the officers had concerns about E.R.'s veracity, there is nothing on the record to suggest that A.R.'s statements were unreliable. A.R. described Mr. Mulamba's car and

license plate. Her daughter was in possession of a disposable nicotine pen. Yet Mr. Mulamba only told officers he was "supposed to go to the gym" on that night. After A.R. told "Amiro Fenomeno" that he was reported to police, he began deleting messages and calling E.R.'s phone repeatedly. Ex 1-I, Ex. 6 at p. 2. SA Jacob verified that Mr. Mulamba's phone contained the Snapchat account for Amiro Fenomeno or Amir Fenomeno—the same name reported by A.R. and seen on E.R.'s phone. Viewing the totality of those circumstances, the court agrees there was a fair probability that evidence of a sex crime would be found on Mr. Mulamba's phone. See United States v. Stevens, 530 F.3d 714, 718–19 (8th Cir. 2008) (detailed, eyewitness account combined with "corroboration of even innocent, minor details can support finding of probable cause"); United States v. Zamora-Garcia, 831 F.3d 979, 984 (8th Cir. 2016) (nervous behavior can support finding of probable cause).

Mr. Mulamba's citation to United States v. Waldrip does not persuade the court otherwise. See Docket No. 99 at p. 11 (citing 2019 WL 13143479, at *5 (S.D. Iowa April 3, 2019)). In that case, officers seized Waldrip's phone without any indication that evidence of criminal activity existed on it. Waldrip, 2019 WL 13143479, at *1–2, 5–6. Officers had earlier viewed evidence of a drug shipment on an acquaintance Brown's phone and imputed probable cause to search Waldrip's phone based on that evidence. Id. at *5. The court held that the evidence of the shipment seen on Brown's phone established probable cause for Brown's phone only. Id. The court found "the most that can be gleaned from the Government's evidence is that Waldrip had a cell

phone and, at some point during the investigatory stop, that cell phone was seized." Id.

Here, the impetus for A.R.'s call to officers was evidence of an illegal act she reported seeing exchanged between her daughter's and Mr. Mulamba's Snapchat account. Such a situation is more like that involving Brown's phone in Waldrip, a phone that the Waldrip court found probable cause to search. And although here, an eyewitness rather than an officer viewed the criminal message, the corroborated details supplied by that witness, compounded with Mr. Mulamba's furtive behavior, gave officers more than enough reason to believe evidence of a crime would be found on Mr. Mulamba's phone.

As to exigency, Mr. Mulamba devotes one sentence to his argument: "Further, no exigent circumstance required immediate seizure." Docket No. 99 at p. 12. The court disagrees. The officers suspected, and Mr. Mulamba confirmed, that he was deleting things off his phone once the interview turned to his Snapchat account. Things that embarrassed him, and things he did not like. Yes, Mr. Mulamba may simply not have wanted officers to see images of him in compromising positions. But messages offering vapes in exchange for sex would also likely embarrass Mr. Mulamba. The officers were reasonable in their belief that Mr. Mulamba was swiping away evidence.

The court finds the seizure of Mr. Mulamba's phone was lawful. Counsel for Mr. Mulamba makes much of Det. Meier's statement that, before the interview with Mr. Mulamba, the officers did not have probable cause to believe

Mr. Mulamba committed a crime. Counsel further argues that nothing changed during the interview. The court disagrees.

While speaking to Mr. Mulamba, the officers received confirmation that the vehicle seen at E.R.'s house was his and that on the Sunday night in question, no one else was driving it. SA Jacob was able to confirm that Mr. Mulamba's Snapchat handle was the same Amiro Fenomeno or Amir Fenomeno handle A.R. reported. Furthermore, the officer's observed Mr. Mulamba's demeanor change when the conversation turned to Snapchat and when Mr. Mulamba began furtively deleting things from his phone. These bits of evidence added to the totality of evidence available to the officers and, with everything known before, supplied probable cause for the seizure of the phone.

### B. Whether Omissions and False Statements in SA Jacob's Affidavits Render the Warrants Invalid

Mr. Mulamba attacks the validity of search warrants on the grounds that the supporting affidavits contained false statements and omissions. Docket No. 99 at pp. 15–19.

This court recently explained the showing necessary for entitlement to a Franks hearing:

> A defendant is entitled to a so-called "Franks hearing" only if he makes a substantial preliminary showing that an affiant to a search warrant application (1) knowingly or intentionally, or with reckless disregard for the truth (2) made false statements or omitted material statements, and (3) the alleged statements or omissions were necessary to a finding of probable cause. [Franks v. Delaware, 438 U.S. 154, 155–56 (1978)]. The requirement that the defendant's preliminary showing be substantial "is 'not lightly met.' " United States v. Brackett, 846 F.3d 987, 993 (8th Cir. 2017)

> (quoting Franks, 438 U.S. at 171–72)). Rather, "it requires a defendant to offer specific allegations of deliberate falsehood along with supporting affidavits or similarly reliable statements." Id. Likewise, because there is "a presumption of validity with respect to the affidavit supporting the search warrant ... [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks, 438 U.S. at 171. Instead, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." Id.

United States v. Echols, No. 4:24-CR-40019-LLP, 2024 WL 4728743, at *3 (D.S.D. Sept. 13, 2024), adopted in part, 2024 WL 4533372 (D.S.D. Oct. 21, 2024).

As a preliminary matter at the evidentiary hearing, this court determined that Mr. Mulamba made a substantial showing in his briefing entitling him to put on evidence of a Franks violation. At the hearing, it became Mr. Mulamba's burden to show by a preponderance of the evidence that a Franks violation necessitated the invalidation of the search warrants. See Franks, 438 U.S. at 156. For the reasons stated below, the court holds that Mr. Mulamba failed to make that showing.

**1. The Search Warrant for Mr. Mulamba's Phone**

Mr. Mulamba argues that the search warrant for his phone must be invalidated because the affidavit (1) failed to reference the fact that $300 was found in E.R.'s account that E.R. attributed to a different man; (2) misstated the time Mr. Mulamba took to retrieve his phone as nine minutes; (3) mentioned a nude photo of E.R. despite E.R. telling officers she never sent that

photo to Mr. Mulamba; (4) mentioned the GrayKey extraction of E.R.'s phone but did not include that no relevant evidence was found on her phone; and (5) noted Mr. Mulamba's consent, which Mr. Mulamba argues the officers obtained only by stating they were in receipt of a search warrant. Docket No. 99 at pp. 15–19.

Even if a correction of these omissions negates probable cause as to a child pornography violation, the court agrees with the government that the affidavit still could have supported probable cause to search for evidence of sex trafficking, in violation of 18 U.S.C. § 1591. See Docket No. 109 at pp. 13–14. The affidavit explained that A.R. reported to police that her daughter, age 16, had been offered vapes in exchange for sex. Ex. 7 at p. 4. A.R. reported that she witnessed her daughter approach Mr. Mulamba's vehicle outside her residence. Between A.R. and E.R., they identified Mr. Mulamba's Snapchat handle, vehicle color, license plate, and appearance. Id. at pp. 4–5. It described how E.R. told officers that Mr. Mulamba withheld other vapes for later meetings. The affidavit describes Snapchat as a method by which E.R. provided Mr. Mulamba her address. Id. at p. 4. It described the officers' ability to confirm several details of A.R. and E.R.'s report, including his Snapchat handle, and Mr. Mulamba's reliance on Wi-Fi and inability to use cellular networks. Id. at pp. 4–5. Despite this, the affidavit recounts how Mr. Mulamba denied ever meeting up with anyone named "E," denied traveling to her part of town on the night in question, and admittedly began deleting things from his phone when officers broached the subject of Snapchat. Id. The

affidavit made mention that E.R. told officers that Mr. Mulamba knew she was 16. Id. at p. 4.

The affidavit might have been better supported with other details from Officer Olson's report, such as the fact that A.R. viewed messages on Mr. Mulamba's phone detailing the proposed transaction, or Mr. Mulamba's repeated phone calls and deletion of messages in Officer Olson's presence. But the affidavit, in its hypothetical form setting aside the items raised by Mr. Mulamba, would still convince this court there was a fair probability evidence of a crime (sex trafficking of a minor) existed on Mr. Mulamba's phone. That is all the law requires. Shrum, 59 F.4th at 972 (8th Cir. 2023). Probable cause is not predicated on SA Jacob's selection of the correct statute matching the alleged criminal activity. United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007) ("It is not necessary for an affidavit to include the name of the specific crime alleged."); cf. United States v. Thomas, No. 4:22-CR-40046-1, 2023 WL 7390476, at *8 (D.S.D. Aug 29, 2023), adopted, 2023 WL 7103367 (D.S.D. Oct. 27, 2023) (probable cause to conduct traffic stop not dependent on officer's selection of accurate statute when writing citation).

**2. The Search Warrants for Mr. Mulamba's Snapchat, Amazon, and Gmail Accounts**

For reasons including the asserted omissions and misrepresentations described above, Mr. Mulamba argues that the warrants for his Snapchat, Amazon, and Gmail accounts should be invalidated. Counsel paints with a broad brush with regard to arguments that search warrants subsequent to the cell phone warrant were invalid, writing that these subsequent search warrants

"included many of the same misstatements and omissions as the affidavit in support of the [cell phone] warrant." Docket No. 99 at pp. 8–11. But each affidavit reveals significant differences not addressed by Mr. Mulamba. Mr. Mulamba must establish the invalidity of each warrant.

For example, the Snapchat affidavit includes the statement about the suspicious $300 found in E.R.'s possession and the nine-minute wait for Mr. Mulamba to retrieve his phone, but there is no mention of a nude photo found in E.R.'s Snapchat application, no mention of a search of E.R.'s phone, and no mention of Mr. Mulamba's purported consent to search his cell phone. See Ex. 8 at pp. 8–11. Similarly, the affidavit for the search of Mr. Mulamba's Gmail and Amazon accounts included a reference to the nine-minute wait, but did not include any of the other allegations asserted in connection with the cell phone affidavit—there is *no* mention of a suspicious $300 in E.R.'s possession, no mention of Mr. Mulamba's purported consent, no mention of a search of E.R.'s phone or the nude photo of E.R. found in her Snapchat app. See Ex. 9 at pp. 5–9; Ex. 12 at pp. 4–8.

Besides relying on this generalized argument as to the Snapchat, Gmail, and Amazon warrants, Mr. Mulamba also argues they are invalid because SA Jacob described videos found on Mr. Mulamba's phone portraying a prepubescent juvenile (H.N.B.) when she was not prepubescent. Docket 99 at pp. 18–19. The government argues that the videos still depict a juvenile, which alone is sufficient for probable cause. Docket No. 109 at p. 27. The court agrees.

The affidavits described videos of juvenile H.N.B. of a sexual nature on Mr. Mulamba's phone, including one where she inserted what looked like a hairbrush into her vagina. See, e.g., Ex. 9 at p. 7. This was followed by a Snapchat message from H.N.B. showing an iPhone and stating, "a purple one of that." Id. Another message was described where Mr. Mulamba agreed to send H.N.B. an iPhone if she sent him a video of her having sex. Id. SA Jacob also described a screenshot showing an iPhone ordered on Amazon and sent to H.N.B.'s address. Id. at p. 8. It also stated that Mr. Mulamba's Gmail account related to an Amazon account associated with both Mr. Mulamba and H.N.B.'s address. Id. at p. 9. Mr. Mulamba does not attack any of these facts. They, alone, establish probable cause that evidence of a sex crime could be found in Mr. Mulamba's Snapchat, Amazon, and Gmail accounts. That SA Jacob described H.N.B. as prepubescent rather than as a juvenile changes nothing. The search warrants remain valid.

Because the warrants are valid, the question of Mr. Mulamba's consent to search his phone is immaterial. Utah v. Strieff, 579 U.S. 232, 240 (2016) ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.") (quoting United States v. Leon, 468 U.S. 897, 920 n.21 (1984)); see Docket No. 99 at pp. 12–14 (arguing Mr. Mulamba's "consent" was involuntary).

**C. Whether the Search of Mr. Mulamba's Phone Exceeded the Scope of the Warrant**

Mr. Mulamba next argues that the search of his phone exceeded the scope provided in the warrant. Docket No. 99 at p. 19. That warrant

incorporated the parameters of Attachment B, which limited the date range of the search to contents dated on or after May 1, 2021. Ex. 7 at pp. 2, 10. The government argues that SA Jacob only viewed what the warrant permitted. Docket No. 109 at pp. 29–30.

At the evidentiary hearing, Analyst Nathan Hauck testified that the software used to download Mr. Mulamba's phone cannot filter on date range. He testified that he sent the entirety of the cell phone’s contents to SA Jacob, who is then able to, and testified that he did, filter those contents by date. Analyst Hauck testified that he did not filter out the contents of his report before sending it to SA Jacob because it may have resulted in evidence being lost.

This court had the opportunity to consider this same issue in United States v. Debevec. No. 4:23-CR-40033-KES, 2024 WL 4487286, at *20–21 (D.S.D. June 28, 2024) (Debevec I), adopted as modified, 2024 WL 4024154 (D.S.D. Sept. 3, 2024) (Debevec II). There, this court explained that “[w]here searching officers obey the dictates of a search warrant as to the places to be searched, but unlawfully seize items that are not authorized . . . under the terms of the warrant, the unlawfully seized items must be suppressed, but the lawfully seized evidence is not subject to exclusion.” Id. at *20 (citing Waller v. Georgia, 467 U.S. 39, 43 n.3 (1984); United States v. Decker, 956 F.2d 773, 779 (8th Cir. 1992)).

The exception to this general rule is where officers show a “flagrant disregard for the limitations of the search warrant [that] might make an

otherwise valid search an impermissible general search and thus require the suppression or return of all the evidence seized during the search." Id. (quoting Decker, 956 F.2d at 779). There, just as here, the court found that the procedure Analyst Hauck outlined did not represent such a flagrant disregard, but only an incidental seizure of extraneous data. Id. And even if data outside the prescribed date range was unlawfully seized, there, just as here, the government was not attempting to put on evidence from it, so there was nothing to be suppressed. Id.

The district court agreed. Debevec II, 2024 WL 4024154, at *13. The district court recognized the technical limitations faced by the officers necessitating overinclusion in early stages of the seizure. Id. The district court held that "[m]ere overinclusion of data at step one does not render the entire search unreasonable." Id.

The same is true here. Although overinclusion at early stages resulted in more of Mr. Mulamba's phone being downloaded and transferred to SA Jacob than allowed by the warrant, SA Jacob testified that he was able to then apply filters to comply with the warrant before examining the phone's contents. The court found that procedure lawful in Debevec, and it does here as well. Debevec I, 2024 WL 4487286, at *21.

**CONCLUSION**

Based on the facts, law, and analysis discussed above, this magistrate judge respectfully recommends denying Mr. Mulamba's motion to suppress [Docket No. 98] in accordance with this opinion.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Nash v. Black, 781 F.2d 665, 667 & n.3 (8th Cir. 1986)

DATED this 6th day of December, 2024.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge